[Cite as *State v. Hughes*, 2015-Ohio-151.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 14AP-360 |
| v. | : | (C.P.C. No. 13CR-3810) |
| Franchesco Hughes, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on January 20, 2015

*Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

*Carpenter Lipps & Leland LLP*, *Kort Gatterdam* and *Erik P. Henry*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Franchesco Hughes, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty one count of rape and one count gross sexual imposition. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed July 19, 2013, plaintiff-appellee, the State of Ohio, charged appellant with one count of rape, in violation of R.C. 2907.02, a felony of the first degree, and one count of gross sexual imposition, in violation of R.C. 2907.05, a felony of the fourth degree. Both charges related to an incident on June 7, 2013 involving the same victim, N.P. Appellant entered a plea of not guilty.

{¶ 3}  Before the trial began, the state noted on the record that the state had offered a plea deal to appellant: if he entered a guilty plea to the rape charge, the state would dismiss the gross sexual imposition charge.  Appellant's counsel noted he had advised his client to take the plea offer but that appellant refused and wanted to go to trial.

{¶ 4}  At trial, appellant wore leg irons at the order of the trial court.  The state presented the testimony of N.P., the victim.  N.P., who was 15 years old at the time of trial, identified appellant as the father of N.P.'s cousin, F.H.  N.P. explained that on the evening of June 6, 2013 she was babysitting for appellant's two daughters.  That evening, N.P. and F.H. fell asleep on the couch in the living room of appellant's house around 11:00 p.m.  When appellant returned home around 5:45 a.m. on June 7, 2013, N.P. said she woke up from the sound of him coming in the house.  Appellant went into the dining room and put his coat down, then N.P. said appellant walked back to the couch she was sharing with F.H. and appellant "started feeling on" her.  (Tr. 41.)

{¶ 5}  N.P. testified that appellant did not say anything to her when he first approached her, but he got down on his knees next to the couch.  N.P. said appellant first started touching her upper chest underneath the blanket but on top of her shirt.  N.P. testified that appellant touched her on her breasts twice and kissed her on her forehead.  After he kissed her forehead, N.P. said that appellant "stuck his hand up into [her] shorts," went inside her underwear, and penetrated her vagina with his fingers.  N.P. was not sure whether appellant used one finger or more than one finger, but she stated appellant digitally penetrated her two times.  (Tr. 44.)  As this was happening, N.P. started kicking her younger cousin to try to wake her up.  N.P. testified that she started screaming, and once F.P woke up, appellant got up and ran upstairs.  When appellant ran away, N.P. said she grabbed F.H., they "both started crying," and then they went back to sleep. (Tr. 46.)

{¶ 6}  N.P. further testified that appellant woke her up around 9:00 a.m., told her to get dressed, and "told [her] not to worry, he was going through some shit."  (Tr. 49.)  Appellant drove N.P. back to her grandparents' house, and F.H. went into the grandparents' house, leaving appellant and N.P. alone in the car because appellant asked N.P. to stay for a minute.  Appellant told N.P. "not to tell, and then told [her] again that he

was going through some shit." (Tr. 52.) N.P said she did not say anything in response to appellant, and she got out of his car and went into her grandparents' house. When she went inside, N.P. started crying, woke her mother up and told her what had happened. N.P. said she felt sore on the inside of her genitals. N.P.'s mother called the police, and an officer came to N.P.'s grandparents' house. N.P. told the police officer what had happened, and the officer showed N.P. a picture of appellant on a computer screen which caused N.P. to start crying again. At the officer's request, N.P. gave the officer the shorts and underwear she had been wearing at the time of the attack. N.P. said the police officer drove N.P., her mother, and F.H. to the doctor.

{¶ 7}  When she first arrived at the doctor's office, N.P. spoke with a social worker who asked N.P. to tell her what had happened. N.P. testified that she told that woman the truth. N.P. then saw a doctor who performed a physical exam, and N.P. stated she was truthful with the doctor. Appellant's counsel did not cross-examine N.P.

{¶ 8}  The state next called F.H., the victim's cousin and appellant's daughter. F.H., who was in fourth grade at the time of trial, testified that during the early morning hours of June 7, 2013, F.H. fell asleep on the couch with N.P. while they were at F.H.'s father's house. F.H. woke up to the sound of crying and felt N.P. kicking her. F.H. said she opened one of her eyes and saw her "dad's head go up and down" by N.P.'s head, so she closed her eyes again but N.P. kept kicking her. (Tr. 73-75.) She then woke up and said N.P. jumped up and appellant ran upstairs. F.H. testified that at that point, N.P. hugged her and told her that appellant had raped N.P. N.P. was crying and told F.H. she was scared and wanted to go home. F.H. said they tried to tell her stepmother what had happened but that her stepmother would not listen, and N.P and F.H. went back to sleep.

{¶ 9}  F.H. said she woke up later that morning because appellant, her father, woke her and N.P. up and told them to get ready to leave. After her father drove the two girls to their grandparents' house, F.H. said her father told her to get out of the car and told N.P. he needed to talk to her. F.H. went into the house, and when N.P. came in she was crying and told her that "[appellant] told me to forgive him." (Tr. 78.) F.H. then heard N.P. tell her mother that her vagina hurt. F.H. described the arrival of the police officer and riding along with N.P. to go to the doctor, but she was not in the room with N.P. when the doctor examined her. Appellant's counsel did not cross-examine F.H.

{¶ 10} Officer Helen Adrian of the Columbus Division of Police testified that she responded to a call of a reported sexual assault on the morning of June 7, 2013. Officer Adrian said that when she arrived at the home, she first spoke with N.P. to make sure she was not injured and that she did not need immediate medical attention. In the presence of N.P.'s mother, Officer Adrian asked N.P. to describe what had happened. Officer Adrian also spoke with F.H., and she said F.H. "corroborated everything that [N.P.] had said." (Tr. 90.) Officer Adrian explained that she pulled up a photograph of appellant on her cruiser computer screen because she wanted to know what he looked like in case he showed up while she was interviewing N.P. but that she did not intend for N.P. to see the picture. When Officer Adrian called N.P. over to the cruiser to ask her some more questions, she forgot she had appellant's photograph on the computer screen, and when N.P. saw the photograph, "she started hyperventilating, she started crying, and she said that she was going to throw up." (Tr.93-94.)

{¶ 11} Officer Adrian testified she then collected N.P.'s clothing as evidence and transported N.P., her mother, and F.H. to the Children's Hospital Advocacy Center. Officer Adrian turned the evidence bag over to Detective Brubaker. Appellant's counsel did not cross-examine Officer Adrian.

{¶ 12} The state then called Dr. Farah Brink, who works as a child abuse pediatrician at Nationwide Children's Hospital. After testifying about her training and qualifications, the state moved to declare Dr. Brink an expert in child abuse exams and appellant's counsel did not object. Dr. Brink was covering the outpatient clinic at the Children's Advocacy Center on June 7, 2013 when N.P. came in for her exam. Using the medical records from N.P.'s visit, Dr. Brink testified that N.P. reported "digital genital contact, * * * kissing to both sides of her neck[,] * * * fondling over her clothes of her breasts, and she disclosed fondling under her clothes of her genital and anal areas." (Tr. 129.) Dr. Brink described all the different swabs that were collected from the areas of N.P.'s body in which she indicated physical contact from appellant. After conducting the physical examination, Dr. Brink did not notice any physical trauma to N.P. but said that was consistent with the history N.P. provided to her about the interaction with appellant. Dr. Brink additionally stated that in "females who have been sexually assaulted, greater than 90 percent of those examinations are normal," meaning there is no physical injury

detected during the exam. (Tr. 137-38.) When the prosecutor said "your finding no documentation of trauma does not mean that this little girl was lying," Dr. Brink responded, "[n]ot at all." (Tr. 139.) Appellant's counsel did not cross-examine Dr. Brink.

{¶ 13} Abby Schwaderer of the Ohio Bureau of Criminal Investigations ("BCI") testified about the DNA testing performed in this case. The state offered Schwaderer as an expert forensic scientist, and appellant's counsel did not object. Schwaderer testified the DNA testing did not show any DNA foreign to N.P. from the vaginal swabs. Schwaderer described something called "victim-[m]asking" that is common with vaginal swabs in which the amount of female DNA present is so concentrated that it can mask any other DNA that may have been left behind. For three of the skin swabs conducted, both the victim's DNA was present as well as additional DNA from an unknown source. Schwaderer said that even though there was no foreign DNA detected inside N.P.'s vagina, that did not lead to the conclusion that digital penetration did not happen. Appellant's counsel did not cross-examine Schwaderer.

{¶ 14} The state's last witness was Jennifer Westgate, the licensed social worker who interviewed N.P. at the Children's Advocacy Center. The state offered Westgate as an expert in forensic interviewing, and appellant's counsel did not object. Westgate described the general process of interviewing child victims, which includes asking open-ended questions "in order for the child to be able to provide their own narrative, so [the social worker is] not putting words in their mouth." (Tr. 189.) She further explained that before the doctor performs his or her exam, the doctor will talk to the social worker about what the child discloses in the interview and "that will guide [the doctor's] diagnosis, their treatment, depending on what type of testing they might do, things of that nature." (Tr. 190.)

{¶ 15} When Westgate interviewed N.P. on June 7, 2013, she said N.P. told her that she was babysitting at appellant's house and that when appellant returned home in the early morning, he "knelt in front of the couch and then grabbed her breasts. She said she elbowed him, and then he moved his hand up her basketball shorts, moved her underwear aside and began to rub her private part. She said he rubbed outside of her private part, and put one to two fingers inside of her private part." (Tr. 193-94.) Appellant's counsel objected to this testimony as hearsay, but the trial court overruled the

objection as a statement made for the purpose of medical diagnosis or treatment.  Once again, appellant's counsel did not cross-examine the witness.

{¶ 16} Appellant testified in his own defense.  He said the night of June 6 and into the morning of June 7, 2013, he consumed "a pretty good deal" of alcohol.  (Tr. 205.) Appellant said he "didn't really remember a whole lot" from that night and that he has "a problem with alcohol" causing blackouts from time to time.  (Tr. 205.)  He remembered talking to N.P. the next morning and telling her he "was going through a lot of shit," and asking her to forgive him.  (Tr. 208.)  Appellant said it "broke [his] heart to see [his] daughter" testify, but that because of his "loss of memory," he does not "have any defense."  (Tr. 211.)  On cross examination, the prosecutor asked appellant whether he could say N.P. and F.H. were lying in their testimony, and he responded he could not say whether they were or not.

{¶ 17} Following deliberations, the jury returned guilty verdicts for both counts. After the trial but before sentencing, on April 9, 2014, the trial court docketed letters it had received from appellant in which appellant complained about the representation he received from his trial counsel.  The trial court conducted a sentencing hearing on April 16, 2014 and imposed a sentence of five years imprisonment for the rape conviction and twelve months imprisonment for the gross sexual imposition conviction.  The trial court ordered the sentences to run consecutively for a total aggregate sentence of six years. Additionally, the trial court classified appellant as a Tier III sexual offender.  The trial court journalized the convictions and sentence in an April 24, 2014 judgment entry. Appellant timely appeals.

## II. Assignments of Error

{¶ 18} Appellant assigns the following four errors for our review:

> [1.] Appellant was denied his rights to a fair trial, to counsel, to present a defense, and to due process contrary to the Ohio and United States Constitutions when the trial court ordered appellant to wear leg irons throughout trial without adequate justification.
>
> [2.] The repeated instances of improper bolstering of the alleged victim's testimony through hearsay statements deprived appellant of his state and federal constitutional rights to due process and a fair trial under the Fifth and

Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

[3.] Appellant was deprived of his rights to a fair trial and due process contrary to the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution because a doctor presented opinion testimony indicating the alleged victim was not lying about the incident.

[4.] Appellant was deprived of the effective assistance of trial counsel in violation of appellant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Section 10 and 16, Article I of the Ohio Constitution.

## III. First Assignment of Error - Leg Irons

{¶ 19} In his first assignment of error, appellant argues the trial court violated his right to due process when it ordered appellant to wear leg irons throughout his trial without adequate justification.

{¶ 20} "It is well-established that no defendant should be tried while shackled, except as a last resort." *State v. Chester*, 10th Dist. No. 08AP-1, 2008-Ohio-6679, ¶ 5, citing *Illinois v. Allen*, 397 U.S. 337, 344 (1970). *See also State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 104 (stating "we have long recognized that 'no one should be tried while shackled, absent unusual circumstances' "), quoting *State v. Kidder*, 32 Ohio St.3d 279, 285 (1987). The decision whether to shackle a criminal defendant during trial lies within the sound discretion of the trial court. *Chester* at ¶ 5, citing *State v. Morgan*, 84 Ohio App.3d 229, 232 (5th Dist.1992). "The trial court must exercise its own discretion and not leave the issue up to security personnel." *Adams* at ¶ 104, citing *Woodards v. Cardwell*, 430 F.2d 978, 981-82 (6th Cir.1970).

{¶ 21} However, a criminal defendant does not have an absolute right to be free from shackles during trial. *Chester* at ¶ 6, citing *State v. Blackmon*, 10th Dist. No. 94APA05-773 (Feb. 14, 1995). Although shackling is an extreme measure, it is widely accepted that a defendant may be shackled where there is a danger of violence or escape. *Id.*, citing *State v. Cunningham*, 10th Dist. No. 90AP-427 (July 25, 1991), and *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 79; *Adams* at ¶ 104. Because the decision to shackle a defendant is left to the sound discretion of the trial court, the record should

reflect the factors the trial court considered in exercising its discretion.  *Chester* at ¶ 7, citing *State v. Jones*, 10th Dist. No. 02AP-1390, 2003-Ohio-5994, ¶ 24.  "Where the surrounding facts and circumstances illustrate a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it."  *Id.*, citing *Jones* at ¶ 25, citing *Franklin* at ¶ 82.

{¶ 22} Appellant asserts the trial court abused its discretion in both failing to hold a hearing on the use of shackles and in ordering appellant to wear the leg irons throughout the trial.  Although the trial court did not hold a separate hearing on the issue of shackles, prior to jury selection, the courtroom deputy informed the trial court that he needed to get another pair of larger leg irons that would fit appellant.  Thereafter, the following exchange occurred:

> [DEFENSE COUNSEL]:  I don't think he's going to actually run.  Is there any way we can get the handcuffs because - -
>
> THE DEPUTY:  One's going to be for the other.  Leg irons go on him.
>
> THE COURT: I'd rather have him wear leg irons than handcuffs so he can have a pen and paper.
>
> [DEFENSE COUNSEL]: I think if he had neither, he's not going to run but - -
>
> THE DEPUTY: (Unintelligible.)
>
> [DEFENSE COUNSEL]:  So we have to wait for the leg irons then?

(Tr. 9.)   Thereafter, there was no further discussion on the matter of restraints, and appellant wore the leg irons for the duration of his trial.

{¶ 23}   As we explained above, the trial court must exercise its own discretion and not simply defer to security personnel without inquiring into the specific circumstances requiring courtroom restraints.  Here, the record does not reflect the specific factors the trial court considered before ordering appellant to wear leg irons for the duration of the trial.   The record is not developed enough to indicate whether the trial court truly exercised its own discretion or simply deferred to the courtroom deputy.

{¶ 24} Nevertheless, even if the trial court did not exercise its independent discretion, we find any error in ordering appellant to wear leg irons was harmless error. Concluding that the trial court ordered shackling without exercising the required discretion does not require automatic reversal. *Chester* at ¶ 11, citing *State v. Cardinal*, 10th Dist. No. 05AP-992, 2006-Ohio-5088, ¶ 33. " 'A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt.' " *Cardinal* at ¶ 33, quoting *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 78.

{¶ 25} Here, the error was harmless on several bases. First, nothing in the record indicates the jury ever saw appellant wearing the leg irons. Although appellant asks us to presume the leg irons made noise whenever appellant moved, this argument is mere speculation, and there is nothing in the transcript suggesting the jury knew appellant was wearing leg irons. *Chester* at ¶ 12, citing *State v. Wightman*, 12th Dist. No. CA2006-12-045, 2008-Ohio-95, ¶ 12.

{¶ 26} Second, the trial court took care to prevent the jury from seeing the leg irons. When appellant testified, the trial court moved appellant to the witness stand outside the presence of the jury so that he was already seated before the jury returned. (Tr. 200-01.) *Chester* at ¶ 12, citing *Wightman* at ¶ 12 (the trial court took care to prevent the jury from seeing the shackles).

{¶ 27} Third, nothing in the record suggests appellant was unable to effectively communicate with his counsel due to the leg irons. To the contrary, the trial court specifically declared its preference for leg irons rather than handcuffs so that appellant would be able to write down questions he may have for his attorney during the trial. (Tr. 9.) *Chester* at ¶ 14, citing *Wightman* at ¶ 12 (noting the record did not demonstrate that the shackles inhibited defendant's ability to consult with his attorney or assist in his defense). Additionally, there is no evidence that the use of leg irons contributed to any increase in anxiety that might have materially prejudiced or impaired appellant's right to testify on his own behalf. *Id.*, citing *State v. Leonard*, 157 Ohio App.3d 653, 2004-Ohio-3323, ¶ 46 (1st Dist.). Therefore, we conclude any error in ordering appellant to wear leg irons for the duration of his trial was harmless error. We overrule appellant's first assignment of error.

**IV. Second Assignment of Error - Bolstering**

{¶ 28} In his second assignment of error, appellant argues the trial court erred and violated appellant's rights to due process and a fair trial in allowing repeated instances of what he characterizes as "improper bolstering" of N.P.'s testimony. Appellant asserts the testimony of F.H., Officer Adrian, Dr. Brink, and Westgate all included impermissible hearsay. Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court. *State v. Darazim*, 10th Dist. 14AP-203, 2014-Ohio-5304, ¶ 33, citing *State v. Bartolomeo*, 10th Dist. No. 08AP-969, 2009-Ohio-3086, ¶ 24. As appellant concedes, however, his counsel did not object to the testimony at trial, and thus our review is limited to plain error. *State v. Jackson*, 92 Ohio St.3d 436, 444 (2001), citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus; Crim.R. 52(B). An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 29} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 30} Appellant complains about seven separate instances of testimony that he characterizes as impermissible hearsay used to improperly bolster N.P.'s testimony. More specifically, appellant challenges (1) F.H.'s testimony repeating what N.P. had told her the day of the sexual assault; (2) Officer Adrian's testimony that F.H. corroborated what N.P. had told her; (3) Officer Adrian's testimony that N.P. said she was going to vomit after seeing a picture of appellant; (4) Officer Adrian's testimony that N.P. told her the assault occurred at a different location; (5) Dr. Brink's testimony regarding the medical record compiled the day of N.P.'s visit to the Child Advocacy Center; (6) Dr. Brink's testimony reciting the narrative history of the incident that N.P. had reported to the social worker; and (7) Westgate's testimony regarding her interview with N.P. Appellant argues all of this alleged hearsay testimony was used only for the improper purpose of convincing the jury that N.P.'s testimony had been truthful.

{¶ 31} A statement is inadmissible hearsay when it is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C) and 802. There are exceptions to the hearsay rule, however, and those exceptions are listed in Evid.R. 803 and 804. We will examine each of the seven specific instances of testimony that appellant argues were improper to determine whether the trial court plainly erred in allowing the testimony.

**A. F.H.'s Testimony**

{¶ 32} Appellant first challenges the portion of F.H.'s testimony in which F.H. recounted what N.P. said to her on June 7, 2013. More specifically, appellant argues the following statements made by F.H. were impermissible hearsay used only to bolster N.P.'s credibility: (1) "[N.P.] hugged me and told me that my dad raped her" (Tr. 74); (2) "[N.P.] said, I'm scared. I want to go home. I want my mom. And that's all she said, and then after all of that, she said, [y]our dad raped me" (Tr. 74-75); (3) "She said, [y]our dad raped me. I'm scared, and I want to go home" (Tr. 76); (4) "[I] said, I thought that was a dream. And she said, No, it wasn't. It's real" (Tr. 77); (5) "And she said, [y]our dad told me to forgive him" (Tr. 78); and (6) "[N.P.] went to go grease her hair and said, My hoonoo (phonetic) hurt," which F.H. explained to mean her private part (Tr. 79).

{¶ 33} One of the enumerated exceptions to the hearsay rule is an excited utterance. Pursuant to Evid.R. 803(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. To be an admissible excited utterance, (1) there must occur an event startling enough to produce a nervous excitement in the declarant; (2) the statement must be made while the declarant is still under the stress of excitement the event caused; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event. *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 17, citing *State v. Taylor*, 66 Ohio St.3d 295 (1993). Additional factors for the court to consider include the lapse of time between the event and the statement, the mental and physical condition of the declarant, the nature of the statement, and the influence of any intervening circumstances. *Id.*, citing *State v. Patterson*, 11th Dist. No. 96-T-5439 (May 22, 1998).

{¶ 34} With regard to the first four statements above, N.P. made those statements to F.H. almost immediately after the rape occurred. N.P. was able to wake up F.H. which caused appellant to run upstairs, and then N.P. told F.H. what had just transpired. Being the victim of a sexual assault is an event startling enough to produce nervous excitement, and the immediacy of the statements indicates N.P. was still under the stress of excitement when she made them. The fifth statement above occurred just after appellant drove N.P. and F.H. to their grandparents' house and appellant asked N.P. to stay in the car alone with him. Being isolated with the perpetrator of a sexual assault that had just occurred hours earlier is enough to create a separate startling event that would produce nervous excitement in N.P. Therefore, we conclude the first five statements were excited utterances within the definition provided in Evid.R. 803(2) and thus were not impermissible hearsay.

{¶ 35} Another enumerated exception to the hearsay rule is a statement describing a then-existing mental, emotional, or physical condition. Evid.R. 803(3) provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule. The sixth statement above, that N.P. told F.H. that her "hoonoo" hurt, is a statement describing a then-existing physical condition and is therefore admissible under Evid.R. 803(3).

### B. Officer Adrian's Testimony

{¶ 36} Appellant next challenges Officer Adrian's testimony. First, appellant argues Officer Adrian's testimony that F.H. "corroborated everything that [N.P.] had said" was impermissible hearsay used to bolster F.H.'s testimony. (Tr. 90.) "In general, statements offered by police officers explaining their conduct while investigating a crime 'are not hearsay because they are not offered for their truth, but, rather, are offered as an explanation of the process of investigation.' " *Bartolomeo* at ¶ 17, quoting *State v. Warren*, 8th Dist. No. 83823, 2004-Ohio-5599, ¶ 46. Here, Officer Adrian was describing her general investigatory process as she gathered information about the incident. She was not explicitly vouching for the credibility of F.H. or N.P. but was explaining that F.H. told her the same thing that N.P. told her while she was investigating. Further, the declarant, F.H., testified at trial and her testimony during direct examination was to the same effect

as Officer Adrian's statement. *Id.* (noting that even if the testimony was improper, the declarant testified at trial alleviating the normal concerns of hearsay statements).

{¶ 37} Similarly, Officer Adrian's testimony that N.P. told her the incident occurred at another location was not offered for the truth of the matter asserted but was a description of Officer Adrian's investigatory process relating to the need to collect evidence. Thus, this statement was not impermissible hearsay.

{¶ 38} Additionally, Officer Adrian's testimony that N.P. "said she was going to throw up" when she saw the picture of appellant on the police cruiser computer was not impermissible hearsay. (Tr. 94.) N.P.'s statement was a description of her then-existing physical condition and was inadmissible under Evid.R. 803(3), as we outlined above.

**C. Dr. Brink's Testimony**

{¶ 39} Appellant further argues portions of Dr. Brink's testimony included impermissible hearsay used to bolster N.P.'s credibility. Dr. Brink identified state's exhibit C, a medical report that appellant argues contained hearsay, opinions, and evidence not supported by other testimony in the record. (State's Exhibit C.) Under Evid.R. 803(4), "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are excepted from the hearsay rule. Appellant does not point out what, specifically, in the medical records constitutes inadmissible hearsay, other than noting that the records include notes from Ebony Cherry and Dr. Megan Letson who did not testify. However, even if we were to agree that portions of State's Exhibit C contain hearsay, the medical records are cumulative to the testimony presented at trial, including Dr. Brink's testimony about her physical exam of N.P., Westgate's testimony about her interview with N.P., and N.P.'s testimony about the incident itself. Appellant does not explain how the inclusion of these notes in the medical record, even if error, would have affected the outcome of the trial. Thus, the admission of State's Exhibit C does not amount to plain error.

{¶ 40} Dr. Brink also testified about the narrative history of the incident provided to her by Westgate. She explained that she relies on the information she receives from the social worker in these types of cases so that she does not have to unnecessarily make the

victim answer the same questions more than once. (Tr. 119.) Thus, these statements were not offered for the truth of the matter asserted, and we do not agree that this testimony was hearsay. Additionally, this testimony falls into the exception to hearsay stated in Evid.R. 803(4) for statements made for the purposes of medical diagnosis or treatment. Dr. Brink used Westgate's statements to determine a course of medical examination and treatment.

### D. Westgate's Testimony

{¶ 41} Finally, appellant challenges portions of Westgate's testimony, the licensed social worker and forensic interviewer who interviewed N.P. at the Children's Advocacy Center. Westgate testified about what N.P. told her during the interview, and appellant's attorney objected to this line of testimony, arguing it was inadmissible hearsay. Because there was an objection to this testimony, we need not apply the plain error standard and instead look to whether the trial court abused its discretion in admitting the testimony. *Darazim* at ¶ 16 (stating "[a] trial court has broad discretion over the admission or exclusion of evidence, and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion that materially prejudices the affected party"), citing *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. No. 11AP-603, 2012-Ohio-4371, ¶ 73, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001).

{¶ 42} When appellant objected at trial, the state responded that the statements of the social worker were admissible as statements made for purposes of medical diagnosis or treatment under Evid.R. 803(4), and the trial court agreed. Appellant argues Evid.R. 803(4) should not apply because the social worker is not a medical professional. Appellant relies on *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, which held at paragraph one of the syllabus, "[s]tatements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination."

{¶ 43} Appellant's reliance on *Arnold* is misplaced for two reasons. First, appellant's argument ignores the second paragraph of the syllabus of *Arnold* which states "[s]tatements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the

Confrontation Clause." *Id.* at paragraph two of the syllabus. This holding is consistent with this court's previous holdings that " '[t]he [hearsay] exception set forth in Evid.R. 803(4) extends to statements made to social workers as long as the purpose of the statement is part of initiation of medical diagnosis or treatment.' " *State v. Vance*, 10th Dist. No. 06AP-1016, 2007-Ohio-4407, ¶ 70, quoting *State v. Jordan*, 10th Dist. No. 06AP-96, 2006-Ohio-6224, ¶ 20, citing *State v. Nasser*, 10th Dist. No. 02AP-1112, 2003-Ohio-5947, ¶ 52. Westgate explained that her interview with N.P. was intended to assist the examining physician in making her diagnosis and deciding on the appropriate treatment. (Tr. 189-90.) The statements N.P. made to Westgate were for purposes of medical diagnosis and treatment and were not elicited in an interrogation-like atmosphere as appellant contends. Second, paragraph one of the syllabus in *Arnold* is explicit that the statements violate the Confrontation Clause only when the declarant is *unavailable for cross-examination*. *Arnold* at paragraph one of the syllabus. N.P. testified here, so there was no concern regarding the Confrontation Clause. *See also Vance* at ¶ 70 (noting that where the social worker was repeating statements made to her by the victim and the victim testified at trial and was subject to cross-examination, the admission of the social worker's statements do not violate the appellant's right to due process and right to confront witnesses under the Sixth Amendment to the United States Constitution and the Tenth Amendment to the Ohio Constitution), citing *State v. Boyer*, 10th Dist. No. 06AP-05, 2006-Ohio-6992, ¶ 18.

{¶ 44} Thus, all of the above testimony falls within legitimate exceptions to the hearsay rule, or, in the case of State's Exhibit C, does not amount to plain error. Additionally, much of appellant's argument suggests the testimony of these witnesses could be interpreted by the jury as vouching for the veracity of N.P. However, " '[o]nly statements directly supporting the veracity of a child witness are prohibited under [*State v. Boston*, 46 Ohio St.3d 108, 129 (1989)].' " *State v. L.E.F.*, 10th Dist. No. 13AP-1042, 2014-Ohio-4585, ¶ 29, quoting *State v. Cashin*, 10th Dist. No. 09AP-367, 2009-Ohio-6419, ¶ 20, citing *State v. Rosas*, 2d Dist. No. 22424, 2009-Ohio-1404, fn. 1. " '[I]ndirect bolstering of a victim's credibility is not the same as the direct rendering of an opinion as to a victim's veracity that was involved in *Boston*.' " *Id.*, quoting *Cashin* at ¶ 20. Furthermore, here, as in *L.E.F.*, the victim testified at trial and the jury was able to

independently ascertain her credibility. *Id.* For all of the foregoing reasons, the trial court did not err when it allowed these seven instances of testimony. We overrule appellant's second assignment of error.

## V. Third Assignment of Error - Doctor's Opinion Testimony

{¶ 45} In his third assignment of error, appellant argues the trial court erred in allowing Dr. Brink's opinion testimony about whether N.P. was being truthful. Appellant challenges two exchanges between the prosecutor and Dr. Brink. In the first, the prosecutor asked, "Are these findings consistent, in your expert medical opinion, with the history she gave to you folks?" Dr. Brink responded, "Yes." (Tr. 137.) In the second exchange, the prosecutor asked, "And your finding no documentation of trauma does not mean that this little girl was lying?" to which Dr. Brink responded "Not at all." (Tr. 139.) As appellant concedes, appellant's counsel did not object to either of these exchanges, so we again limit our review to plain error.

{¶ 46} In *Boston*, the Supreme Court of Ohio held that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Boston* at syllabus. In *Boston*, the child victim's pediatrician was "allowed to express her opinion that [the child victim] had not fantasized her abuse and that [the child victim] had not been programmed to make accusations against [the defendant]." *Id.* at 128. The Supreme Court concluded this testimony had the effect of "declar[ing] that [the child victim] was truthful in her statements," and thus the admission of that testimony was improper, prejudicial, and amounted to reversible error. *Id.*

{¶ 47} The Supreme Court has since clarified its holding in *Boston*. In *State v. Stowers*, 81 Ohio St.3d 260 (1998), the Supreme Court explained that while "*Boston's* syllabus excludes expert testimony offering an opinion as to the truth of a child's statements (*e.g.*, the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person)," the *Boston* syllabus "does not proscribe testimony which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." *Stowers* at 262-63. (Emphasis sic.) The *Stowers* decision explained that trial courts must "distinguish between expert testimony that a child witness is telling the truth and

evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused." *Id.* at 262. (Emphasis sic.)

{¶ 48} As we noted in our resolution of appellant's second assignment of error, this court has noted the careful distinction between direct opinion testimony about a child's veracity and indirect bolstering of a victim's credibility. *L.E.F.* at ¶ 29, citing *Cashin* at ¶ 20. Here, Dr. Brink did not offer an opinion as to whether N.P. was telling the truth about her allegation or telling the truth that it was appellant who perpetrated the sexual assault. Instead, Dr. Brink's testimony was to explain why a lack of physical trauma on N.P.'s body did not mean a physician could rule out sexual abuse.

{¶ 49} Additionally, even if we were to conclude Dr. Brink's testimony amounted to improper bolstering, any error in admitting the testimony would be harmless error. " 'Recent case law states that "*Boston* does not apply when the child victim actually testifies and is subjected to cross-examination." ' " *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 61, quoting *State v. Benjamin*, 8th Dist. No. 87364, 2006-Ohio-5330, ¶ 19, quoting *State v. Curren*, 5th Dist. No. 04 CA 8, 2005-Ohio-4315, ¶ 26. "When the child victim testifies, the trier of fact is 'able to ascertain the credibility of the victim; whereas, in *Boston*, there was no independent indicia of reliability save for the expert witness who vouched for the child victim.' " *Id.*, quoting *Benjamin* at ¶ 16. Thus, any error in admitting expert testimony regarding the veracity of a child victim is harmless beyond a reasonable doubt " 'if the victim testifies and is subject to cross examination, the state introduces substantial medical evidence of sexual abuse, and the expert's testimony is cumulative to other evidence.' " *Id.* at ¶ 62, quoting *State v. Kincaid*, 9th Dist. No. 94CA005942 (Oct. 18, 1995).

{¶ 50} Here, N.P. testified and was available for cross-examination, allowing the jury to judge N.P.'s credibility independently from Dr. Brink's testimony. Additionally, there was substantial medical evidence of sexual abuse from N.P.'s visit to the Children's Advocacy Center. Finally, Dr. Brink's testimony was cumulative to other evidence at trial, including the testimony of N.P. herself, and the testimony of F.H., Officer Adrian, and Westgate. Thus, for all of these reasons, appellant cannot demonstrate plain error from the trial court's admission of this testimony. We overrule appellant's third assignment of error.

## VI. Fourth Assignment of Error - Ineffective Assistance of Counsel

{¶ 51} In his fourth and final assignment of error, appellant argues he was deprived of his constitutional right to the effective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, appellant must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires appellant to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If appellant can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, appellant must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694.

{¶ 52} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Appellant contends his trial counsel was ineffective in (1) failing to object to the use of leg irons; (2) failing to make an effective opening statement; (3) failing to cross-examine any of the state's witnesses; (4) failing to object to repeated alleged hearsay statements; (5) failing to object to Dr. Brink's opinion testimony about N.P.'s veracity; (6) failing to object to the trial court declaring Westgate an expert in forensic interviewing; (7) failing to object to evidence of appellant's prior criminal record; (8) calling appellant as a witness or failing to effectively prepare appellant to testify; and (9) failing to make an effective closing statement.

### A. Leg Irons, Alleged Hearsay Statements, and Opinion Testimony

{¶ 53} Appellant's first, fourth, and fifth instances of alleged ineffective of counsel reflect appellant's assignments of error on appeal. Because appellant's trial counsel failed to object to these alleged errors, we reviewed appellant's arguments under a plain error standard, and, in disposing of appellant's first three assignments of error, we concluded appellant was unable to demonstrate the outcome of his trial would have been different had it not been for these errors. " '[W]here the failure to object does not constitute plain

error, the issue cannot be reversed by claiming ineffective assistance of counsel.' " *State v. Roy*, 10th Dist. No. 14AP-223, 2014-Ohio-4587, ¶ 20, quoting *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 51. Having previously held, in addressing appellant's first, second, and third assignments of error, that the conduct complained of either did not constitute error or did not rise to the level of plain error, we conclude appellant's argument in this regard fails to satisfy the second prong of the *Strickland* test.

{¶ 54} With respect to appellant's first, fourth, and fifth instances of alleged ineffective assistance of counsel, we find appellant has failed to demonstrate that trial counsel committed errors so serious that, but for these errors, there would be a reasonable probability that the outcome of the trial would have been different. *Carson* at ¶ 52.

### B. Opening and Closing Statements

{¶ 55} Appellant next argues his trial counsel was ineffective in failing to make an effective opening or closing statement. Given the brevity of both the opening and closing statements, we include them in their entirety to guide our discussion.

{¶ 56} By way of opening statement, appellant's trial counsel stated:

> Good morning. As the prosecutor pointed out, this is basically a road map that we're laying out for you. While these are serious charges, this will be a relatively short case. There is not a whole lot for me to lay out. The state must prove what they have laid out beyond a reasonable doubt. Each and every one of you promised to remain fair and impartial until you have heard all of the evidence, received the law, and are in the jury room and debating this issue. I am confident that you will. Thank you.

(Tr. 29-30.) Appellant argues this opening statement was deficient in failing to refute any of the prosecutor's allegations made in the state's opening statement and in failing to offer the defense's own "roadmap" of how the case would unfold. However, appellant points to no authority indicating his counsel was required to make a more detailed opening statement. To the contrary, counsel's decision to give only a brief opening statement may have been a strategic decision given the damaging evidence against appellant. This court has previously concluded that even trial counsel's decision to forego an opening statement altogether does not constitute ineffective assistance of counsel

where the decision may have been a tactical choice. *State v. Horton*, 10th Dist. No. 06AP-311, 2007-Ohio-4309, ¶ 45.

{¶ 57} For the closing argument, appellant's counsel stated:

> I told you at the beginning of this trial it's going to be a relatively short trial. So there's not really a whole lot for closing arguments. You are the finders of fact. You determine credibility. However, I will remind you that the state has the burden of proof in proving each and every element beyond a reasonable doubt. You have heard from the witnesses; you have heard from the defense. He did not have to testify. It's his constitutional right not to testify, but he did. You heard what he had to say. He has pled not guilty. He stands on his not guilty, and we are confident that you will do your duty. Thank you.

(Tr. 225-26.) Appellant argues his trial counsel's closing statement was deficient in failing to discuss the difficulty of proving guilt beyond a reasonable doubt, failing to discuss the presumption of innocence, failing to point out the lack of physical evidence supporting the state's case, and failing to point out possible bias in the state's witnesses.

{¶ 58} While we agree with appellant that his trial counsel certainly could have said more to advocate on his client's behalf, appellant does not point to anything in the closing argument that amounts to prejudice sufficient to satisfy the second prong of *Strickland*. Further, the evidence at trial against appellant was overwhelming, so defense counsel's decision not to rehash or highlight that evidence may have been a tactical decision. "Tactical or strategic trial decisions, even if ultimately unsuccessful, will not substantiate a claim of ineffective assistance of counsel." *State v. Ryan*, 10th Dist. No. 08AP-481, 2009-Ohio-3235, ¶ 77, citing *In re M.E.V.*, 10th Dist. No. 08AP-1097, 2009-Ohio-2408, ¶ 34.

### C. Failure to Cross - Examine the State's Witnesses

{¶ 59} Appellant further argues his trial counsel was ineffective in failing to cross-examine any of the state's witnesses. Indeed, the record reflects that appellant's trial counsel did not ask a single question to any one of the state's witnesses on cross-examination.

{¶ 60} "The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *Conway* at ¶ 101,

citing *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 45. Trial counsel's decision not to cross-examine N.P. and F.H., both minors, is a reasonable and understandable trial tactic given the sensitive nature of this case. Indeed, appellant stated during his testimony that he "didn't want to add insult to injury by bringing the girls in this court." (Tr. 210.) Admittedly, while counsel may not have exercised the best judgment in not cross-examining the state's other witnesses, appellant cannot demonstrate that this decision, even if indicative of a deficient performance, amounted to prejudice under the second prong of *Strickland*. *Id*. at ¶ 102. N.P.'s testimony, standing alone, was sufficient to convict appellant of both charges beyond a reasonable doubt, and, as we already stated, counsel's decision not to cross-examine the child victim of a sexual assault does not amount to ineffective assistance of counsel.

### D. Failure to Object to Declaration of an Expert

{¶ 61} Appellant argues his trial counsel was ineffective in failing to object to the state's offering Westgate as an expert in forensic interviewing. Appellant characterizes Westgate's job responsibilities as simply asking N.P. questions, and appellant argues that role is not beyond a lay person's knowledge or experience.

{¶ 62} Under Evid.R. 702(B), an expert may be qualified by specialized knowledge, skill, experience, training, or education to give an opinion that will assist the jury in understanding the evidence and determining a fact at issue. Neither certification nor special education is required to confer expert status upon a witness. *State v. Hunt*, 10th Dist. No. 12AP-103, 2013-Ohio-5326, ¶ 57, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 32. The witness offered as an expert need not have complete knowledge of the field in question as long as he or she possesses knowledge that will aid the trier of fact in performing its factfinding function. *Id*., citing *Drummond* at ¶ 113.

{¶ 63} Pursuant to Evid.R. 702:

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

The Supreme Court has held that professional experience and training in a particular field may be sufficient to qualify one as an expert. *State v. Mack*, 73 Ohio St.3d 502, 511 (1995).

{¶ 64} Westgate testified that she is a licensed social worker and that she has both a bachelor's and master's degree in social work. She described her experience working in numerous homes performing case therapy, case management, and treatment. She further described her position as a forensic interviewer at the Children's Advocacy Center, and she explained the licensing process involved in becoming a forensic interviewer. Westgate testified she had performed about a thousand interviews of children who have been sexually abused during her career. (Tr. 185-87.) This testimony was sufficient for the trial court to declare Westgate an expert under Evid.R. 702.

{¶ 65} Additionally, even if we were to agree with appellant that it was error for his counsel to fail to object to Westgate's expert status, appellant does not articulate how Westgate's qualification as an expert prejudiced him. Though he argues generally that opinion testimony can be damaging, he does not cite anything specific regarding Westgate's testimony. As we noted in our resolution of appellant's second assignment of error, Westgate's testimony regarding the statements N.P. made during their interview were admissible as statements made for purposes of medical diagnosis or treatment under Evid.R. 803(4) even without her status as an expert. Thus, we conclude appellant is unable to demonstrate ineffective assistance of counsel from his trial counsel's failure to object to the declaration of Westgate as an expert.

### E. Failure to Object to Evidence of Appellant's Prior Criminal Record

{¶ 66} During Officer Adrian's testimony, Officer Adrian explained how she obtained a photograph of appellant while she was in her police cruiser. Officer Adrian stated that she went through photographs "we already had in our database." (Tr. 92.) Appellant argues that his counsel's failure to object to this statement amounted to ineffective assistance of counsel because it alerted the jury that appellant had a prior criminal record.

{¶ 67} We disagree with appellant. Officer Adrian did not testify that the photograph of appellant was a mug shot or a Department of Rehabilitation and Corrections photograph. She simply said it was a photograph already in her database without specifying what that database was. It is entirely possible that appellant's counsel chose not to object so as not to highlight any evidence linking appellant to a prior criminal record. We do not agree with appellant that this tactical decision satisfies even the first prong of the *Strickland* test.

### F. Calling Appellant as a Witness or Failing to Adequately Prepare Appellant to Testify

{¶ 68} Appellant next argues his trial counsel was ineffective for either calling appellant as a witness in his own defense or in failing to adequately prepare appellant to testify. We agree with appellant that his testimony at trial was largely damaging to his case and did not aid his defense.

{¶ 69} In general, a decision to allow a defendant to testify in his own defense constitutes a tactical decision. *See State v. Washington*, 10th Dist. No. 98AP-1489 (Nov. 9, 1999). There is nothing in the trial record indicating appellant was testifying either in conformance with or in direct contradiction with his counsel's wishes. It is possible defendant insisted on testifying on his own behalf even though he had been advised not to. We cannot find ineffective assistance of counsel from trial counsel's calling appellant to testify where appellant relies on merely speculative arguments. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 57. Further, appellant cannot demonstrate that his testimony prejudiced the outcome of trial. Even without his admittedly damaging testimony, the state had already presented ample evidence of appellant's guilt. Thus, appellant is unable to satisfy the second prong of the *Strickland* test.

{¶ 70} As to appellant's argument that his trial counsel was ineffective for failing to adequately prepare him to testify, the record again does not demonstrate the requisite prejudice for the second prong of *Strickland*. Although appellant sent a letter to the trial court following the verdict, but before sentencing, in which he complained about his counsel's representation and accused his counsel of failing to prepare for the trial, appellant does not explain how his counsel's lack of preparation for appellant's testimony

can overcome the other evidence at trial establishing appellant's guilt. Even accepting as true appellant's allegation that his counsel did not properly prepare him to testify, we are limited by the second prong of *Strickland*, and appellant has failed to demonstrate the requisite prejudice from his counsel's lack of preparation for appellant's testimony. *See State v. Woodman*, 10th Dist. No. 99AP-694 (Mar. 30, 2000) (concluding that even though defendant's counsel inadequately prepared for appellant's sexual predator hearing, the record does not disclose how the defendant was prejudiced from that failure and therefore the defendant failed to show ineffective assistance of counsel).

### G. Cumulative Effect of Errors

{¶ 71} Appellant finally argues that even if we conclude that none of the above nine alleged errors are sufficient to find ineffective assistance of counsel standing alone, the cumulative effect of these errors nonetheless resulted in appellant being denied a fair trial.

{¶ 72} Appellant relies on *State v. DeMarco*, 31 Ohio St.3d 191 (1987) for the proposition that although errors at trial singularly "may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *Id.* at paragraph two of the syllabus. Appellant urges us to conclude that his trial counsel's many errors, when considered together, deprived him of a fair trial. *State v. Sieng*, 10th Dist. No. 99AP-282 (Dec. 30, 1999) (concluding that "the improper bolstering of [a witness'] testimony and the character attacks on defendant" was enough for the defendant to show by a reasonable probability that the results of the proceeding would have been different but for his counsel's unprofessional errors), citing *DeMarco* at 196.

{¶ 73} We agree with appellant that his counsel's overall performance, when considered cumulatively, is sufficient to satisfy the first prong of *Strickland*. His performance in failing to ask a single question on cross-examination of any of the state's witnesses, in only lodging one objection throughout the entire trial, in making only the most minimal of opening and closing statements, and in possibly failing to prepare his client to testify, taken together, was deficient.

{¶ 74} Even though we agree that appellant was able to demonstrate his counsel's overall performance was deficient under the first prong of *Strickland*, we are nonetheless constrained by the second prong of *Strickland* which requires appellant to demonstrate

that but for his counsel's performance, the outcome of the proceedings would have been different.  Here, there was ample evidence to convict appellant.  Although appellant complains about his counsel's various failures in regard to that evidence, we not do find that appellant can overcome the fact that the victim testified very clearly about what happened in this case.  The decision not to cross-examine the victim was a reasonable trial tactic given the victim's age and the sensitive nature of the case.  In light of the victim's testimony, we conclude appellant is unable to demonstrate the requisite prejudice under the second prong of *Strickland*.  Accordingly, we overrule appellant's fourth assignment of error.

## VII. Disposition

{¶ 75}  Based on the foregoing reasons, any error in ordering appellant to wear leg irons was harmless error, and the trial court did not plainly err in relation to allowing alleged hearsay statements and improper opinion testimony.  Additionally, appellant was unable to demonstrate ineffective assistance of counsel under the second prong of *Strickland*.  Having overruled appellant's four assignments of error, we affirm the decision of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and BROWN, JJ., concur.

———————————